GENERAL FIRE EXTINGUISHER CO., RESPONDENT, *v.*
NORTHWESTERN AUTO SUPPLY CO., APPELLANT.

(No. 4,928.)

(Submitted November 28, 1922.  Decided December 18, 1922.)

[211 Pac. 308.]

*Contracts—Interpretation—Contingent Clauses—Waiver — Evidence—Insufficiency—Offer and Acceptance—Foreign Corporations—"Doing Business" in State—Isolated Transactions—Directed Verdicts—Appeal.*

Foreign Corporations—"Doing Business" in State—Isolated Transactions.
    1. Isolated transactions, whereby a foreign corporation sells goods manufactured in another state and shipped into Montana by such corporation for use or installation, does not constitute the doing of business in this state within the meaning of sections 6651, 6653, Revised Codes of 1921, prescribing the conditions under which foreign corporations may do business in the state.

Contracts—Province of Courts to Interpret Only.
    2. It is the province of courts to interpret contracts which are open to interpretation, not to make new ones for the parties or to alter or amend those which they have made.

Same—Offer and Unconditional Acceptance Necessary.
    3. In order to form a contract there must be an offer by one party and an unconditional acceptance of it by the other in accordance with its terms, the party making the offer having the privilege to prescribe the mode by which acceptance must be made.

Same—Contingent Clause—Waiver—Evidence—Insufficiency.
    4. Where a contract to install an automatic fire-extinguisher in a business place was made contingent on the ability of the company installing it to secure lower insurance rates on the building and contents, evidence *held* not to support the company's contention that the buyer had waived the insurance clause.

Same—Contingent Clause—Construction by Parties Controlling.

    5. Where both parties to a contract by their correspondence with relation to a contingent clause therein had construed the clause as binding months after the work was completed, their construction of it must be accepted as controlling.

Trial—Directed Verdict—Motion by Both Parties—Appeal.

    6. The rule that where both parties at the close of all the testimony move for a directed verdict, the directed verdict will not be disturbed on appeal if there is substantial evidence to support it and the law warrants it, *held* inapplicable, the verdict being neither supported by substantial evidence nor warranted by the law.

*Appeals from District Court, Yellowstone County; Robert C. Stong, Judge.*

ACTION by the General Fire Extinguisher Company against the Northwestern Auto Supply Company. From a judgment for plaintiff and from an order denying its motion for new trial, defendant appeals. Reversed and remanded, with directions.

*Messrs. Grimstad & Brown,* for Appellant, submitted a brief; *Mr. O. K. Grimstad* argued the cause orally.

In view of the authorities below, we respectfully submit that respondent was not entitled to maintain its action, not having complied with the laws of this state, and that therefore the motion of appellant asking for nonsuit should have been granted. Clearly, the transaction, on the face of it, was not one involving interstate commerce but was one involving intrastate commerce. (*Browning* v. *City of Waycross,* 233 U. S. 16, 34 Sup. Ct. Rep. 578; *Palm Vacuum Cleaner Co.* v. *Bjornstad,* 136 Minn. 38, L. R. A. 1917C, 1012, 161 N. W. 215; *United States Construction Co.* v. *Hamilton Nat. Bank of Fort Wayne* (Ind.), 126 N. E. 866; *In re Springfield Realty Co.,* 257 Fed. 785; *General Ry. Signal Co.* v. *Commonwealth of Virginia,* 246 U. S. 500, 38 Sup. Ct. Rep. 360.)

Assuming, for the sake of argument, that the so-called contingency clause was waived by appellant, we still insist that the waiver is of no effect and that respondent cannot take advantage of it, for the reason that if appellant did waive it, it was done upon the statements of the respondent which

subsequently turned out to be false. (*Fishback* v. *Van Dusen,* 33 Minn. 111, 22 N. W. 244; *Hutchings* v. *Binford et al.* (Tex. Civ. App.), 206 S. W. 557; *Frankfurt-Barnett Co.* v. *William Prym Co.,* 237 Fed. 21, 150 C. C. A. 223; *Berman* v. *Fraternities Health & Accident Assn.,* 107 Me. 368, 78 Atl. 462; *First Nat. Bank of Los Angeles* v. *Maxwell,* 123 Cal. 360, 55 Pac. 980; *Schillinger Brothers Co.* v. *Bosch-Ryan Grain Co.* (Iowa), 116 N. W. 132; *Brown* v. *Winehall,* 3 Wash. 454, 28 Pac. 1037; *Enterprise Mfg. Co.* v. *Eli Oppenheim,* 114 Me. 368, 79 Atl. 1007; *State of South Carolina* v. *State Board of Canvassers,* 78 S. C. 461, 59 S. E. 145; 27 R. C. L. 908; *Enterprise Sheet Metal Works* v. *Schendel,* 55 Mont. 42, 173 Pac. 1095; *Champion Spark Plug Co.* v. *Automobile Sundries Co.,* 273 Fed. 74.)

*Messrs. Waldo & Cunningham,* for Respondent, submitted a brief; *Mr. Wm. B. Waldo* argued the cause orally.

There is not only no allegation that plaintiff was doing business in the state of Montana, but also there is a lack of proof. The proof at its best was merely that one other, two in all, sprinkler systems were sold and installed in Montana. That such isolated transactions do not constitute doing business is held in *Dover Lbr. Co.* v. *Whitcomb,* 54 Mont. 141, 168 Pac. 947; *Uihlein* v. *Caplice Commercial Co.,* 39 Mont. 327, 102 Pac. 564. (See, also, Fletcher's Cyc. Corp., sec. 5919.) This was a transaction in interstate commerce. (*York Mfg. Co.* v. *Colley,* 247 U. S. 21, 62 L. Ed. 963, 38 Sup. Ct. Rep. 430.) In view of the case of *International Text Book Co.* v. *Pigg,* 217 U. S. 91, 18 Ann. Cas. 1103, 27 L. R. A. (n. s.) 493, 54 L. Ed. 678, 30 Sup. Ct. Rep. 481, there can be no question but that to deprive a foreign corporation of the right to the use of a state court for enforcement of its contract in interstate commerce is an unlawful interference with such commerce.

With respect to waiver, appellant misses the true conception of respondent's theory which is, not that a term of a completed contract was waived, but that a term of a submitted proposal was waived. The position is also taken that respondent un-

derstood that the term of the proposal had been waived and that since that term, if not waived, affected the promise of the appellant to pay, the said appellant ought not, in view of the interpretation it was bound to know respondent was placing upon its letter, to be allowed to say that it was not waived. This invokes not only the well-understood doctrine of estoppel which was pleaded in the reply and supported by the evidence (Tr., pp. 66–68), but also the doctrine that "if the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed at the time of making it that the promisee understood it." (Codes 1921, sec. 7540.) Our contention is that appellant waived the contingency clause prior to the formation of the contract on October 19, 1917, and the letters set forth in the stipulation appearing in the transcript constitute our principal reliance, though we think all the circumstances as disclosed by the evidence tend but to support this view.

Courts have not much interest in the inducing cause of a contract. The question is for them—just what were the terms of the contract. On this proposition of inducing cause and the weight to be given to it, this court has so recently expressed itself with such ample citation of authorities that we will do nothing here but refer to the cases of *Helena Light & Ry. Co.* v. *Northern Pac. Ry. Co.*, 57 Mont. 93, 186 Pac. 702, and *Harrington* v. *Moore Land Co.*, 59 Mont. 421, 424, 196 Pac. 975.

MR. JUSTICE GALEN delivered the opinion of the court.

This action was instituted by the plaintiff to recover the sum of $1,933.34, together with interest and costs, the sum stated claimed to be due it under contract for installing and equipping a three-story building and basement at Billings, belonging to the defendant, with a system of automatic sprinklers and fire-extinguishing apparatus. It is alleged in the first count of plaintiff's complaint that the plaintiff agreed to install the system in such building for the sum of $5,530, provided that the number of the sprinklers installed did not exceed

444, and that if more or less than this number were required, they should be charged for or credited, whichever way it might be, at the rate of $5 each; that the amount to be paid for such installation and equipment should be one-third cash when the work was commenced, one-third when the water was turned on and the property under protection, and the balance after the completion of the work specified; further that the plaintiff completed its work in accordance with contract on or about the eighteenth day of April, 1918, and that 462 sprinklers were required and installed in the building; that by reason thereof the defendant became indebted to the plaintiff in the sum of $5,620; and that no part thereof was paid, save and except the sum of $1,843.33, paid on April 13, 1918, and $1,843.33, paid on June 8, 1918, leaving a balance due of $1,933.34, made the basis of the action. In a second count of the complaint the plaintiff seeks a recovery of the same amount, with interest and costs, based upon a *quantum meruit.*

By its answer the defendant denied that there was any sum or amount whatsoever due the plaintiff, and that the plaintiff had performed its contract, admitting that it had paid to the plaintiff the amounts stated in plaintiff's complaint on the dates alleged, and that it had not made any other or further payments. The defendant then pleaded in special defense many matters not necessary here to be recited, other than the following: The breach of the terms of plaintiff's contract, which is set forth and made a part of the answer, and that the plaintiff is a foreign corporation, not authorized to do business in the state of Montana at the time the alleged contract was made, at the time of the filing of the complaint, or at all, by reason of having failed to comply with the law regulating the conditions under which foreign corporations may do business in this state. Several counterclaims for damages are pleaded by the defendant in its answer, aggregating a total of $14,386.66.

Plaintiff's replication denies all new matters alleged in defendant's answer, save that it is admitted that it is, and was at all times mentioned in the complaint, a foreign corporation.

It is then alleged by the plaintiff that the transaction with the defendant was one in interstate commerce, in consequence whereof no duty rested on the plaintiff to comply with the law regulating the transactions of foreign corporations in this state. And among other things pleaded affirmatively in its reply was a modification and waiver by the defendant of certain of the terms of plaintiff's proposed contract before the execution of the work by it. Upon issue thus joined, the case was tried before a jury. At the conclusion of all of the testimony in the case, both the plaintiff and the defendant made separate motions for a directed verdict. Plaintiff's motion was granted, and the defendant's denied. Thereupon a verdict was rendered and filed as follows: "We, the jury impaneled and sworn in the above-entitled action by direction of the court, do find the issues herein in favor of the plaintiff, and assess damages at nineteen hundred thirty-three and 34/100 dollars ($1,933.34), with interest thereon at 8 per cent per annum from the date when the last payment was due under the contract, to-wit, May 18, 1918, and that defendant take nothing by its counterclaim."

Judgment was entered upon the verdict. This appeal is both from the judgment and from an order denying defendant's motion for a new trial.

As we view this appeal, there are but two questions presented necessary for decision, *viz.:* (1) May the plaintiff, not having complied with our laws regulating foreign corporations doing business within this state, maintain this action; and (2) was the plaintiff guilty of such a breach of its contract as to defeat its right of recovery?

1. Section 6651 of the Revised Codes of 1921 provides the **[1]** conditions under which a foreign corporation, other than "insurance companies and corporations otherwise provided for," may do "business within this state"; and section 6653 provides that any corporation commencing or attempting "to do business in this state" without complying with the law shall be without remedy to enforce its contracts until it shall have complied with the law. The plaintiff falls within the

category of foreign corporations required to comply with section 6651 before doing business in this state, and the question arises as to whether the business done by the plaintiff, such as is disclosed by the record in this case, constituted *doing business* within the state, in violation of the statute. The record discloses that the plaintiff sent its agent to Montana to secure a contract for the installation of plaintiff's fire-extinguishing apparatus; that the sprinklers and apparatus were fabricated at Warren, Ohio; Chicago, Illinois; Auburn and Providence, Rhode Island; that they were then shipped to Billings, where they were installed in defendant's building under the direction of a trained and experienced expert in plaintiff's employ; that in connection with such installation, plaintiff employed certain local labor necessary, and made purchase at Billings of many small articles required, such as "nails, strips of tin, and stuff like that." The plaintiff has never established any office or place of business in Montana, nor does it manufacture any of its apparatus or materials within the state. The plaintiff company equipped one other building in Montana with fire-extinguishing apparatus shortly before the job done by it for the defendant, all in the same manner and under circumstances similar as to process of installation and place of securing necessary incidental labor and materials, in a warehouse of the Great Western Sugar Company, at Billings.

In volume 9 of Fletcher's Cyclopedia Corporations, section 5919, we think the rule is well stated as follows: "In construing the effect of statutes prohibiting a foreign corporation from 'doing business' or 'doing any business' in the state until it has complied with specified requirements, there is some conflict, but the great weight of authority is to the effect that isolated transactions, especially commercial, do not constitute a 'doing, transacting or carrying on a business' within the meaning of such statutes, but that such statutes contemplate some continuance in business. It has been said that 'doing business' implies, in this connection, corporate continuity of conduct in that respect, such as might be evinced by the investment of capital in the state, with the maintenance of an of-

fice for the transaction of business and those identical circum-
stances which attest the corporate intent to avail itself of the
privilege to carry on a business.''

Again the same author states the rule as follows: ''The trans-
action or doing of business within the state, within the pro-
hibition of the statute relating to foreign corporations with-
out compliance with certain requirements, does not cover a
single business transaction or an isolated transaction.   An iso-
lated act of a foreign trust company in acting as trustee under
a deed of trust and as such collecting interest, taking title to
property, *etc.*, does not constitute 'carrying on business' within
the state.   The making of a contract by a trust company ad-
ministering a trust, to sell trust property in another state, is
not 'doing business' in that state, so as to bar an action be-
cause of failure to obtain the permit required of foreign cor-
porations.''   (Vol. 10, 1921 Supp., Fletcher's Cyc. Corp., sec.
5919.)

Numerous authorities will be found collected to the same
effect under ''Doing Business'' in 2 Words and Phrases, Sec-
ond Series, 108, and the decisions of this court fully uphold
the doctrine, and conform to the views here expressed. (*Pow-
der River C. Co.* v. *Commissioners of Custer County*, 9
Mont. 145, 22 Pac. 383; *Uihlein* v. *Caplice Commercial Co.*, 39
Mont. 327, 102 Pac. 564; *Dover Lumber Co.* v. *Whitcomb*, 54
Mont. 141, 168 Pac. 947.)   In the *Uihlein Case*, above cited,
it was held that the shipping of beer into this state by a
foreign corporation, and sale thereof to a distributing agent,
does not constitute doing business in the state, within the mean-
ing of the statute.

We entertain the view that isolated transactions, whereby a
foreign corporation sells goods or other manufactured products
on sample or specifications, the same being fabricated in an-
other state and shipped into this state by such corporation for
use or installation, does not constitute the doing of business
in this state, within contemplation of the statute.   Were the
law given a contrary construction, it is easy to see the far-
reaching and absurd consequences which would result.   Trans-
actions of this character were never in legislative contemplation.

It is our opinion that the two isolated transactions of the plaintiff in this case, under the facts recited, do not constitute the "doing of business" in this state within the intent of the statute.

2. Plaintiff contends that the proposal made through its contracting agent, Russel Bonticou, for the installation of the proposed fire-extinguishing apparatus in defendant's building; was modified before the goods were supplied and the work performed by the plaintiff, and that under the express terms of the proposal submitted it could not, and did not, become effective until approved by an executive officer of the plaintiff, which was not accomplished until after such modification. On the other hand, defendant insists that there was no modification of the proposal, and after its acceptance it constituted the agreement of the parties, and claims damages because of its breach by the plaintiff.

It appears that Rockwood Brown, vice-president of the defendant company, negotiated for several days with Russel Bonticou, the plaintiff's traveling representative, respecting the proposed installation of the fire-extinguishing apparatus in defendant's building, resulting in a proposal being made up in plaintiff's behalf by Bonticou, dated August 6, 1917, the portions thereof necessary to be considered being as follows:

"General Fire Extinguisher Company to the Northwestern Auto Supply Co., Billings, Montana:

"Proposal for equipping one three-story and basement building, the property of the Northwestern Auto Supply Co., located at Billings, Montana, on North Broadway, with a dry-pipe system of automatic sprinklers and fire extinguishing apparatus, as described in the within specifications, which are made a part hereof, all of the material to be of standard quality, and the work to be done in a thorough and workmanlike manner, under the rules and regulations of Johnson & Higgins and subject to inspection by them, Johnson & Higgins acting as the agent of both parties, and whose inspection and report shall be conclusive evidence of the proper completion of the work. * * * This contract is made contingent upon your being

able to obtain a net rate of 35¢ on building and 60¢ on contents in companies acceptable to you, the former rate being obtained by writing building insurance for three years if necessary. * * * This company is under no obligation of any kind or nature other than as herein expressly stated, and no change or modification of this proposal shall be valid unless approved in writing by an executive officer of this company. Furthermore, this proposal is subject to change without notice, and becomes void unless an acceptance thereof, in writing, is received by this company within ten days from the date hereof and unless within such time it is approved by an executive officer of this company. The price for the work herein specified is five thousand five hundred thirty dollars ($5,530.00), based upon the installation of 444 sprinklers. Should more or less than this number of sprinklers be required, they will be charged or credited at five dollars ($5.00) each (but this price does not include any extra sprinklers installed because of changes in the building or contents after the completion of this company's plans). Said price to be paid in cash; one-third when work is commenced on the premises; one-third when water is turned on and the property under protection; the balance 30 days after completion of the work herein specified.

"Dated August 6, 1917.

"General Fire Extinguisher Company,

"By Russel Bonticou,

"Contracting Agent.

"Approved by:

"————————————————.

" (President or other executive officer.)

"Acceptance.

"The above proposal is accepted as of this 10th day of August, 1917, and the General Fire Extinguisher Company is authorized to do the work therein specified, and we agree to pay therefor as therein proposed.

"Northwestern Auto Supply Co.,

"By Rockwood Brown.

"Witness: Faith H. Rossiter."

Thereafter a letter was written by the plaintiff from its Kansas City, Missouri, office, directed to the defendant, dated September 19, 1917, and received in due course, reading, so far as pertinent, as follows: "We are in receipt of advice today from Johnson & Higgins, insurance brokers, Chicago, that they are in a position to place the insurance on your building for thirty-five cents annual and the contents sixty cents annual. We trust that this will meet with your approval as we believe that this is a very good arrangement. Mr. Bonticou, who closed this contract, is now at Ft. Sheridan, Ill., in the second officers' reserve camp, and will not return to this office for some time.

"The writer noticed that Mr. Bonticou had a contingency clause that read as follows: 'This contract is made contingent upon your being able to obtain a net rate of 35¢ on the building and 60¢ on the contents in companies acceptable to you, the former rate being obtained by writing insurance for three years if necessary.' This has been accomplished, and these rates have been quoted by Johnson & Higgins, and we trust you will, upon receipt of our letter, write to the effect that we may now proceed with this contract."

On October 11, 1917, the defendant wrote a letter to plaintiff, which was in due course of the mail delivered to it at its Kansas City office, reading: "Replying to your favor of September 19th relative to installation of automatic sprinkler in the Northwestern Auto Supply Company building at Billings, Montana, I wish to advise that you may go ahead with the installation of this. Kindly advise when the work will be started and whether or not it is necessary for us to take any further steps in the matter."

On October 19, 1917, a letter was written from the Cleveland, Ohio, office, by Albert Fritzsche, general sales manager of the General Fire Extinguisher Company, to the defendant herein, and was received in the regular course of mail, the text of which was as follows: "Our Kansas City office has forwarded to us your letter of October 11th authorizing us to proceed with the contract and also waiving the contingency

clause, and therefore you may take this letter as our approval
of contract signed by you on August 10th, with Mr. Russel
Bonticou. Assuring you of our best service on this contract,
we are.''

On December 19, 1917, the defendant wrote to the plaintiff
as follows: ''We wish to acknowledge receipt of blue-prints
showing proposed arrangement of fire protection work in the
Northwestern Auto Supply Company building. The plans are
satisfactory in so far as I am able to find out. This, however,
is considerably of an assumption on my part, as I am not at
all familiar with such matters, and am placing my dependence
upon you.''

On November 12, 1918, the plaintiff wrote the defendant as
follows: ''The inspector for Johnson & Higgins has recently
examined the automatic sprinkler equipment, which we installed
for you, and we are pleased to hand you herewith letter of
approval. J. & H. advise that they are willing to write your
business at the rate furnished by our Kansas City repre-
sentatives; consequently we consider that we have fulfilled our
part of the contract and are now justified in calling on you
for a settlement of the account. Your check for $1,933.34 at
an early date will oblige, or if you prefer we will issue draft
November 20th, which please protect. Statement herewith.''

On November 18, 1918, the defendant wrote as follows to the
plaintiff: ''In Re: 17544. Your letter of November 12th last
has been referred to me, as secretary of the Northwestern Auto
Supply Company. You state therein that Messrs. Johnson &
Higgins advised you that they were willing to write our in-
surance at the rates furnished in the contract, but upon a
reading of the letter from Messrs. Johnson & Higgins to your-
self, it appears to the writer that they have made no definite
statement that the insurance will be written at the contract
rates. We are perfectly willing to pay you the balance due
on the contract as soon as the terms thereof have been com-
plied with, but must request that you have Messrs. Johnson &
Higgins advise us direct that they will write this insurance at
the rates specified in companies which may be indicated by us.

We trust that you will hold up your draft which you state will be sent on November 20th, until this matter has been attended to. Otherwise we will be forced to dishonor same.''

And on December 2, 1918, the plaintiff company wrote: "Replying to your Mr. Brown's letter of November 18th. If you will give your insurance business to Johnson & Higgins, we are confident that they will write it at the rate quoted in your contract. However, we are not inclined to ask Johnson & Higgins for such a letter which could be used unfairly against ·them by getting some one else to meet the rate. We have fulfilled our part of the contract, and there is no reason why we should not receive a settlement of the account. Kindly let us hear from you by return mail, stating definitely what you intend to do regard payment of the balance.''

The fire-extinguisher system was installed complete in the defendant's building, the work being finished about April 18, 1918. Defendant admits that 462 sprinklers were required and were installed, and that all provisions and specifications contained in plaintiff's contract were fully performed on or about April 18, 1918, excepting the provisions of the so-called ''contingency clause'' as to insurance rates. This action was commenced March 24, 1921. It is in evidence, without contradiction, that the ''contingency clause,'' guaranteeing reduced insurance rates, was the moving cause of the execution of the contract by the defendant, and that after the work was completed the defendant learned for the first time that such reduced rates were not obtainable. Rockwood Brown testified: ''Referring now to the letter dated September 19, 1917, that has been called to my attention by Mr. Cunningham, Johnson & Higgins never at any time quoted to me or to the Northwestern Auto Supply Company a rate of thirty-five cents on the building or sixty cents on the contents, as provided for on that contract, and I repeatedly tried to get this quotation from them and from other individuals. In this letter of September 19, 1917, just referred to, in which they state 'this has been accomplished,' this meant to me that it had been accomplished in so far as the plaintiff company was concerned; that

they had obtained this rate, therefore it was satisfactory to go ahead with the contract. They say that definitely in their letter. When I wrote them on October 11, 1917, in which I advised them that they could proceed with the installation of the work, my advice that they should do that was based upon the fact that their letter to me had informed me that Johnson & Higgins had granted to them this insurance rate in question. My main concern was to get the rate for the Northwestern Auto Supply Company. I was not really concerned that Johnson & Higgins should give me this rate, if the plaintiff company, in the meantime, was able to install the sprinkler system and obtain this rate for us from any other source. *    *    *

"I took up with the firm of Johnson & Higgins, mentioned in this contract and correspondence here, the question of obtaining the rates quoted in the contract, on the defendant's building and on the contents. I have already stated that I was not able to obtain that rate from Johnson & Higgins or any other concerns. I took it up, not only with Johnson & Higgins, but with the board of fire underwriters at Butte, and with their agency at San Francisco, and was advised by the board of fire underwriters it was absolutely impossible for Johnson & Higgins to give a better rate than could be granted by the board of fire underwriters at Butte. We were willing to give the insurance business to Johnson & Higgins if they could have quoted us the rate quoted in the contract, provided the insurance was acceptable to us, and I so notified the plaintiff company. *    *    * By the expenditure of a considerable sum of money, under the direction of the board of fire underwriters at Butte, we have been able to get a rate, cut materially since the installation of this system was completed, so that by carrying ninety per cent co-insurance, written for five years on the building, and we have just recently succeeded in getting the rate down to thirty-five cents on the hundred. The rate on the stock, after doing everything possible, as suggested by the board of fire underwriters, and the expenditure of these various sums of money in the shape of improvements,

has been cut down so the present rate is eighty cents as compared with the sixty cent guaranteed rate, or a loss of twenty cents a hundred on a total of $200,000 insurance that was carried. All of this information came from the board of fire underwriters, or their agents at Butte, who have control of all the insurance in this state. * * *

"Immediately after the installation of the sprinkler system was completed, and after I had discovered that the statements which the plaintiff company had made to me that they had secured these rates was false, I took the matter up with the board of fire underwriters at Butte, to ascertain from them, if possible, the lowest rate that could be secured with the system in its present condition, and what changes, if any, could be made by the Northwestern Auto Supply Company, so that the rate could be reduced further. They sent an inspector down here from Butte, who went over the building very carefully, and advised certain changes to be made. I have a memorandum of it here; there were six doors installed on the stairways, at a cost of $120; an elevator door, at a cost of $22; two bins that were steel lined, or iron lined, to hold excelsior or waste, at a total cost of $50; one steel lined bin that cost $85; the elevator shaft was lined or sheathed at a cost of $190; and a Gamewell fire-alarm system, which works automatically, and connected with the chief of the fire department's office, costing $248.40—making a total cost of $695.40. All of this work was done in the summer of 1918, commencing in about June. These amounts of money were expended in order to reduce the insurance rate in order to get it down to thirty-five and sixty cents, in accordance with the contract with the plaintiff company.

"I do not recall whether at that time I took up with any officer of the plaintiff company the question of these changes, in order to bring these insurance rates down. I had a good deal of correspondence with them from time to time. As to the insurance we were paying on the building at the time the plaintiff had installed this sprinkler system, and before these improvements I have just now mentioned were made, after

65 Mont.—25

the installation of the sprinkler system our rate was cut down to 45.4 per hundred on the building. I do not have the exact figures on the contents at that time, it was approximately ninety-five cents, that is, after the installation of the sprinkler system, and before the improvements that I have just related were made. We are now paying a rate on the contents of eighty cents. This is the lowest rate it is possible to get, under any circumstances, after the completion of the sprinkler system. We carry approximately $50,000 on the building and an average of $200,000 on the contents. * * * We would not have had the system installed if we had known we would not been able to obtain these rates. That was the consideration for the entering into this contract, and the only consideration.''

Plaintiff's rights in this case are wholly dependent upon the terms of the contract. The statutory definitions and rules of construction applicable to contracts need not be set forth. They have frequently been adverted to by this court, and recently in the cases of *State Bank of Darby* v. *Pew,* 59 Mont. 144, 195 Pac. 852; *Emerson-Brantingham Co.* v. *Raugstad, ante,* p. 297, 211 Pac. 305.

It is the province of the court to interpret contracts which [2] are open to interpretation, not to make new ones for the parties, or to alter or amend those which they have made. (*Frank* v. *Butte & Boulder Co.,* 48 Mont. 83, 135 Pac. 904; *State Bank of Darby* v. *Pew, supra; Emerson-Brantingham Co.* v. *Raugstad, supra.*)

If the terms of the original proposal as accepted by defend- [3, 4] ant constitutes the contract, there being no waiver or modification of its terms, then plaintiff, not having fulfilled the contract, is without right of recovery. But the plaintiff contends there was a waiver of the terms of the proposal before ratification by an executive officer of the defendant company, and in advance of the furnishing and installation of the appliances called for in the contract; that the contract was fully performed under the modified terms thereof, and in conse-

quence its right of recovery of the balance due is absolute.   As aptly stated in the case of *Steinbrenner* v. *Minot Auto Co.*, 56 Mont. 27, 180 Pac. 729, cited and relied upon by plaintiff: "It is true, as counsel say, that in order to form a contract, there must be an offer by one party and an unconditional acceptance of it by the other in accordance with its terms. * * * It is also settled law that the party making the offer may prescribe the mode by which acceptance must be made, if at all." But this rule in no manner supports plaintiff's claim of right of recovery, for in the case under consideration all of these cardinal principles were adhered to. Plaintiff's counsel place entire reliance upon a waiver of the insurance clause of the contract, based upon the correspondence herein quoted, particularly plaintiff's letter of September 19, 1917, defendant's letter of October 11, 1917, and finally, plaintiff's letter of October 19, 1917, written to defendant by Albert Fritzsche, general sales manager for the plaintiff. But these letters do not show any waiver of the insurance clause by the defendant, nor is it necessary to interpret their meaning to arrive at such conclusion. Covertly, we think, the plaintiff endeavored to get away from the insurance rate clause in the contract, by its letter of October 19, 1917, but that it realized that, in fact, it had not succeeded, is clearly demonstrated by its letters written as late as November 12, 1918, and December 2, 1918. And the defendant was continually insisting upon its rights under the insurance clause and demanding fulfillment. That clause is plain; by it the contract *is made contingent* upon the defendant being able to obtain certain *specified* reductions in insurance rates. Let us briefly review the correspondence to ascertain any possible merit in plaintiff's contention of waiver of that clause. In plaintiff's letter of September 19, 1917, defendant is informed that Johnson & Higgins, insurance brokers, have advised that they are in position to place insurance on defendant's building in accordance with the insurance contingency clause of the contract. No waiver is requested, but in conclusion, after quoting the contingency clause, it is said: "This has

been accomplished and these rates have been quoted by Johnson & Higgins, and we trust you will, upon receipt of our letter, write to the effect that we may now proceed with this *contract.*" What contract? Surely the one in question, containing the insurance clause referred to.

Defendant made reply October 11, 1917, but we do not find one word therein referring to the contract, the insurance clause thereof, or anything waived whatsoever. After acknowledging receipt of plaintiff's letter of September 19, it merely directs plaintiff "to go ahead with the installation," and inquiry is made as to when the work will be started and whether or not it will be "necessary for" defendant "to take any further steps in the matter." Then comes plaintiff's letter of October 19, 1917, wherein it is said: "Our Kansas City office has forwarded to us your letter of October 11th authorizing us to proceed with the *contract, and also waiving the contingency clause.*" Again let us stop to inquire what contract was referred to, and upon what possible word or statement of the defendant is an assumption warranted that the "contingency clause" was to be waived? These questions are effectually answered by the language employed.

On December 19, 1917, the defendant by letter acknowledged receipt of blue-prints, "showing proposed arrangement for fire-protection work," disclaimed familiarity with such matters, and stated entire dependence was placed upon the plaintiff. In its letter of November 12, 1918, plaintiff advises that the work has been inspected and approved by Johnson & Higgins, and also that "J. & H. advise that they are willing to write your business at the rate furnished by our Kansas City representatives; *consequently we consider that we have fulfilled our part of the contract, and are now justified in calling upon you for a settlement* of the account." This language is explicit, and an acknowledgment of its liability on the insurance clause of the contract.

Again, December 2, 1918, plaintiff in its letter says: "If you will give your insurance business to Johnson & Higgins, we are

confident they will write it *at the rate quoted in your contract.*"

From all of this it is clear that plaintiff's contention as to a waiver is wholly unjustified and untenable.

As above shown, months after the work was completed, both [5] parties by their correspondence construed the insurance clause as binding. Their construction should be, and is, accepted. Although independent thereof, we are of opinion that neither plaintiff's letter of September 19, 1917, nor defendant's letter of October 11, 1917, nor plaintiff's letter of October 17, 1917, in any manner effected a waiver of the clause.

We are not unmindful of the settled rule that "Where, at [6] the close of all the testimony, as in the instant case, both parties move for a peremptory instruction directing a verdict, and do nothing more, it is to be assumed that they deem the material facts undisputed, and submit the case to the trial court for determination on the inferences proper to be drawn from such facts. The whole case was thereby submitted on the motions, and the directed verdict will not be disturbed if there was substantial evidence to support it and the law warrants it. (*St. Louis etc. R. Co.* v. *Mulkey,* 100 Ark. 71, Ann. Cas. 1913C, 1339, 139 S. W. 643; *Wells Fargo & Co.* v. *Townsend,* 134 Ark. 560, 204 S. W. 417; *Share* v. *Coats,* 29 S. D. 612, 137 N. W. 402; *Van Woert* v. *Modern Woodmen,* 29 N. D. 442, 151 N. W. 224; *Beuttell* v. *Magone,* 157 U. S. 154, 39 L. Ed. 654, 15 Sup. Ct. Rep. 566 [see, also, Rose's U. S. Notes]; *Empire State Cattle Co.* v. *Atchison etc. R. Co.,* 210 U. S. 1, 15 Ann. Cas. 70, 52 L. Ed. 931, 28 Sup. Ct. Rep. 607; *Fifty Associates Co.* v. *Quigley,* 56 Mont. 348, 185 Pac. 155; *Bank of Commerce* v. *United States F. G. Co.,* 58 Mont. 236, 194 Pac. 158; 38 Cyc. 1582.)" (*Stoltze Land Co.* v. *Westberg,* 63 Mont. 38, 206 Pac. 407.)

However, where, as in this case, there is not only no substantial evidence to support the verdict, but the same is contrary to both the law and the evidence, this court will not hesitate to set it aside in justice to an injured party.

The judgment and order are reversed, and the cause is remanded to the district court of Yellowstone county, with directions to grant defendant a new trial.

*Reversed and remanded.*

ASSOCIATE JUSTICES FARR and HOLLOWAY and HONORABLE JEREMIAH J. LYNCH, District Judge, sitting in place of MR. CHIEF JUSTICE CALLAWAY, disqualified, concur.