GRAHAM AND ROSS MERCANTILE
COMPANY, a corporation,
Plaintiff,

v.

SPROUT, WALDRON & COMPANY, Inc.,
a corporation, Defendant.

Civ. No. 2013.

United States District Court
D. Montana,
Great Falls Division.

June 4, 1959.

Swanberg, Swanberg & Koby, Great Falls, Mont., for plaintiff.

Hall, Alexander & Kuenning, Great Falls, Mont., for defendant.

JAMESON, District Judge.

This is a diversity case removed from state court. Plaintiff is a Montana corporation and defendant a Pennsylvania corporation. The defendant has filed a motion to quash service of summons. Able and exhaustive briefs have been filed by both parties.

Service was made on defendant by delivering to the Secretary of State a copy of the summons and complaint pursuant to R.C.M.1947, § 93–3008, as amended by c. 122, L. 1951, which permits such service on a "corporation organized under the laws of any other state or country that is actually doing business within the state of Montana or that was actually doing business within this state at the time the said action arose even though such corporation has not filed a copy of its charter in the office of the secretary of state of Montana and has not qualified to do business in this state * * *"

Was the defendant "actually doing business within this state" at the time the alleged cause of action arose? An answer to this question is determinative of defendant's motion. Facts pertinent to a determination of this question as set forth in comprehensive affidavits filed by both parties, with correspondence and other documents thereto attached, may be summarized as follows:

In 1955 plaintiff was seeking expert advice on how to remodel its feed mill. It wrote "Feed Age", a business magazine for feed manufacturers. "Feed Age" suggested, among others, defendant Sprout, Waldron & Co., Inc.

Defandant's ad in "Feed Age" stated in part: "You get many *plus* values when you deal with your Sprout-Waldron Man. He has America's most complete line of feed milling equipment. * * *

"You also get on-the-spot guidance in the selection of the exact equipment to fit your needs.

"Your Sprout-Waldron Man is thoroughly trained to solve your problems. He's practical, sincere, and anxious to help you increase your profits year after year. And, being one of a team, he has access to the accumulated experience of the entire Sprout-Waldron sales and engineering staff."

A later ad contained the following: "Sprout-Waldron's Big Plus assures you of expert engineering guidance on installation plus finest workmanship and service * * * plus 100% reliability * * * at no extra cost."

In a letter to defendant dated December 30, 1955, plaintiff inquired about designers or engineers to remodel its mill. Defendant referred plaintiff to its sales representative in plaintiff's territory, Vern S. Behan of Denver, Colo. In a letter to plaintiff dated January 9, 1956, Behan stated in part that defendant "can engineer and design a feed mill of any size or type * * *.

"Your problem * * * is quite similar to many others we have been called upon to correct * * *.

"The writer plans to be in Montana some time in the not too far distant future and I look forward to discussing your requirements in more detail at that time."

In the first part of March, 1956, plaintiff contacted defendant's sales representative at Portland, Oregon, Leonard E. Thompson, whom plaintiff prevailed upon to come to Great Falls to inspect plaintiff's mill, although Montana was outside of Thompson's sales area. As an incentive plaintiff agreed to pay Thompson's expenses if the services of defendant were not further required. Thompson inspected plaintiff's feed mill on April 19, 1956.

The affidavit of John D. Ross, Jr., vice-president of plaintiff, states that Thompson offered plaintiff the engineering services of defendant and "in the event defendant was engaged by plaintiff to prepare plans for the contemplated feed mill improvement and supervise the installation of the same, defendant was to receive a sum equivalent to 3% of the total amount of the construction contract awarded for the installation of the feed mill improvements", but if the contract was awarded to Ken Ward Construction Co., "no isolated or specific charge would be made by defendant for its engineering and supervisory services, as far as plaintiff was concerned".

Thompson drew up "preliminary drawings" and submitted them to plaintiff on May 12, 1956. These plans were "single line" drawings which do not include details of installation for construction purposes, but which illustrate to the customer the planning and layout of a processing line and show the processes to be followed and the general application of equipment. In transmitting the drawings, Thompson stated they involved considerable work. In his affidavit Thompson states that single line drawings are "furnished by salesmen gratuitously to be accepted, rejected or modified by the customer as a part of the sales promotion program of the company."

During May, 1956, Thompson forwarded to plaintiff the bid of Ken Ward Construction Co. The bid was for an amount greater than plaintiff wished to spend. Thompson then revised the plans, outlining them to plaintiff in a letter dated June 1, 1956, thereby reducing the cost. Ward submitted a new bid in accordance with the revised plans. On June 13, 1956, Ward, Thompson and Ross met in Great Falls.

Plaintiff and Ken Ward Construction Co. entered into a contract dated June 27, 1956, for the construction of the feed mill improvements in accordance with defendant's preliminary plans, as revised. Ward purchased machinery and equipment from defendant to use in plaintiff's plant. Thompson agreed with Ward to adjust the machinery and equipment when installed.

After the contract between plaintiff and Ward was signed, Thompson made three trips to Great Falls (August, 1956, November, 1956, and March, 1957) to adjust and start the machinery, making "gratuitous" recommendations to plaintiff concerning the operation of the equipment. Plaintiff contends and defendant denies that representatives of Ward telephoned Thompson frequently for advice during the construction of the machinery.

On November 5, 1956, A. E. Rankin, a service representative of defendant, inspected the mill after complaints to Thompson concerning its operation. In his affidavit, Rankin stated that the difficulty was caused by a belt supplied by Goodyear Rubber and Belting Co., and that his services and advice were rendered gratuitously.

In March, 1957, Frank Allen, district sales manager for defendant, spent two days inspecting the mill and conferring with Thompson. concerning its operation. Allen suggested to plaintiff that defendant was not responsible for the trouble and that the difficulties were caused by equipment other than that manufactured by defendant and engineering services other than those rendered by defendant.

An affidavit of defendant's treasurer recites that defendant has never debited or charged plaintiff for any amount for any purpose and has never received any payment from plaintiff. There was a written agreement between Ward and plaintiff, but none between plaintiff and defendant. Ward, not plaintiff, purchased from defendant the machinery and equipment used in plaintiff's mill.

The foregoing is the extent of defendant's activity in Montana as related in the briefs and affidavits. It is plaintiff's position that defendant failed to "fulfill its agreement to properly design, engineer and supervise the construction of certain improvements to plaintiff's feed mill." Plaintiff does not contend that its action is for sale of defective machinery or faulty construction.

Defendant contends that defendant did not render engineering or supervisory services for plaintiff or for Ward, but rather its sales representative merely inspected plaintiff's plant, made suggestions as to how it could best be modernized and recommended · a construction company to complete the final plans.

A determination of what constitutes doing business within a state depends primarily upon state law. Kansas City Structural Steel Co. v. State of Arkansas, for Use and Benefit of Ashley County, 1925, 269 U.S. 148, 150, 46 S.Ct. 59, 60, 70 L.Ed. 204.[1] It is only when it is determined that the service is valid under state law, that the question of the state's power under the Constitution becomes important.[2] As hereinafter set

---

1. Most cases suggesting a contrary conclusion were decided prior to Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188. See discussion by Judge Goodrich in Partin v. Michaels Art Bronze Co., 3 Cir., 1953, 202 F.2d 541, and particularly footnote 2 at page 542; and Angel v. Bullington, 1947, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832.

2. This was well expressed by Judge Learned Hand in Bomze v. Nardis Sportswear, 2 Cir., 1948, 165 F.2d 33, 35: " * * * thus the first question is whether the

forth, the "enclave" of power of the states has been enlarged by recent decisions of the United States Supreme Court. "(I)t must be kept in mind, however, that, although the U. S. Supreme Court is the final arbiter of the state's constitutional authority, state law applies and many states have not yet fully occupied their newly opened 'enclave' of power. Federal courts, too, must follow the state law, except as to federal venue." Ehrenzweig, Conflict of Laws, p. 112, § 33 (1959).

Counsel have cited three Montana cases. In General Fire Extinguisher Co. v. Northwestern Auto Supply Co., 1922, 65 Mont. 371, 211 P. 308, plaintiff, a foreign corporation, sent its agent to Montana to secure a contract for the installation of fire-extinguishing apparatus fabricated by plaintiff outside of Montana, shipped to Billings, and installed in defendant's building under the direction of plaintiff's employee. Plaintiff had no office or place of business in Montana and did not manufacture any of its apparatus within the state. Plaintiff had installed similar equipment in one other building in Montana. Defendant contended that plaintiff's suit was barred by the statute providing that any corporation commencing or attempting to do business in the state without complying with the law shall be without remedy to enforce its contracts. The court held that plaintiff was not doing business within the state in violation of the statute, stating: "We entertain the view that isolated transactions, whereby a foreign corporation sells

goods or other manufactured products on sample or specifications, the same being fabricated in another state and shipped into this state by such corporation for use or installation, does not constitute the doing of business in this state, within contemplation of the statute." 211 P. at page 310.[3]

Plaintiff attempts to distinguish the case on the ground that "doing business" under the statute requiring compliance with state law is quite different from "actually doing business" under the statute permitting substituted service. This distinction, however, has not been recognized by the Montana Supreme Court. On the contrary, in the case of State ex rel. American Laundry Machinery Co. v. Second Judicial District Court, 1934, 98 Mont. 278, 41 P.2d 26, certiorari denied Second Judicial Court of State of Montana v. State of Montana, 295 U.S. 744, 55 S.Ct. 656, 79 L.Ed. 1690, the court said: "As we have already pointed out, the court in that case (General Fire Extinguisher Co. v. Northwestern Auto Supply Co., supra) was dealing with a different statute from that with which we are concerned here. However, we are unable to find that the meaning of the term 'doing business in the state,' as used in sections 6651 and 6653 (concerning regulation of foreign corporations), is any different from its meaning as used in section 9111 (R.C.M.1947 § 93-3007). In fact it seems to us that the meaning of that phrase, as used in the various sections referred to above,

service was valid under the New York decisions. If we conclude that it was not, of course the case ends; but, if we conclude that it was, there arises the second question: i.e. whether the service was valid under the Constitution."

3. The court quoted with approval the following from 9 Fletcher's Cyclopedia Corporations, § 5919: "In construing the effect of statutes prohibiting a foreign corporation from 'doing business' or 'doing any business' in the state until it has complied with specified requirements, there is some conflict, but the great weight of authority is to the effect that isolated transactions, especially commer-

cial, do not constitute a 'doing, transacting, or carrying on a business' within the meaning of such statutes, but that such statutes contemplate some continuance in business. It has been said that 'doing business' implies, in this connection, corporate continuity of conduct in that respect, such as might be evinced by the investment of capital in the state, with the maintenance of an office for the transaction of business and these identical circumstances which attest the corporate intent to avail itself of the privilege to carry on a business." 65 Mont. at pages 377-378, 211 P. at page 309.

must necessarily be the same in each instance." 41 P.2d at page 29.

In State ex rel. American Laundry Machinery Co. v. Second Judicial District Court, supra, an application was made on behalf of American Laundry Machine Co. and two of its employees for a writ of prohibition to restrain the district court from proceeding with the action against them. One question was whether the machinery company was doing business within the state within the meaning of Revised Codes of 1921, § 9111(2) (R.C. M.1947 § 93–3007) which read in part: "The summons must be served by delivering a copy thereof as follows: * * * 2. If the suit is against a foreign corporation * * * doing business and having a managing or business agent, cashier, or secretary within this state, to such agent * * *." The only evidence before the court of business done within the state by the machinery company was the single transaction involved and statements in affidavits that an agent of the company "frequently comes to * * * Montana in the interest of the * * * Company" and that " 'The * * * Company has, over a period of years, sold many thousands of dollars' worth of machinery in the state of Montana." The court held that this did not satisfy the requirement of "doing business in this state" as used in the statute.

This case was decided prior to the amendment of the statute permitting service on the Secretary of State as agent for foreign corporations not qualified to do business in the state. Service was made upon a branch manager of the machinery company in Seattle when he came into Montana to testify at a trial. Plaintiff attempts to distinguish the case on the ground that the statute required the company to be doing business in the state at the time of service, whereas all of the business alleged to have been done was in the past. The opinion, however, does not suggest that this was the basis for the holding. The court stated: "It is practically impossible to give a definite and comprehensive definition of the term 'doing business in the state.'

* * * In the case of St. Louis Southwestern R. Co. v. Alexander, 227 U.S. 218, 33 S.Ct. 245, 248, 57 L.Ed. 486, it was held that: 'In a general way it may be said that the business must be such in character and extent as to warrant the inference that the corporation has subjected itself to the jurisdiction and laws of the district in which it is served, and in which it is bound to appear when a proper agent has been served with process.' Isolated transactions do not constitute a doing of business within the meaning of the statute; it contemplates a more or less continuing course of business. (Citing cases.) .

"A foreign corporation which makes merely a single sale of its product in the state does not transact business in the state within the meaning of the foregoing corporation statute * * *" 41 P. 2d at page 29.

The same cause of action involved in the American Laundry case was again before the court in State ex rel. Taylor Laundry Co. v. District Court, 1936, 102 Mont. 274, 57 P.2d 772, 775, 113 A.L.R. 1, and the court then issued a writ of supervisory control to annul an order quashing service of summons. This time the affidavits showed that "defendant engaged, not in occasional, isolated transactions, but in a continuous course of business, and that its representatives, when within the state, did something more than solicit sales of merchandise to be shipped into the state—that they adjusted, inspected, and repaired machinery which the company had theretofore sold, and accepted other and old machinery as part payment on the purchase price on new sales." 57 P.2d at pages 775–776. The court did not depart from its prior holding that isolated transactions do not constitute doing business within the meaning of the statute, but held that the affidavits disclosed a "continuous course of business."

The Montana cases impel the conclusion that defendant was not doing business within the State of Montana within the meaning of Section 93–3008, R.C.M. 1947. This is confirmed by the holding

in Clapper Motor Co. v. Robinson Motor Co., D.C.D.Mont.1954, 119 F.Supp. 79, where Judge Pray granted a motion to quash the service of summons on defendant Willys-Overland Motors, Inc., a foreign corporation, on the ground that it was not doing business in the State of Montana. The plaintiff was an automobile dealer at Cut Bank. Defendant Robinson Motor Co., an automobile distributor, entered into a contract with plaintiff whereby the distributor would purchase vehicles from defendant (Willys-Overland) in Toledo, Ohio and sell them to plaintiff in Cut Bank. Defendant was not a party to the contract but its approval was required. Its activity in Montana consisted of visits by representatives to distributors and dealers who noted and reported to the defendant corporation their "methods of doing business, what progress they were making, whether they were gaining or losing ground in their manner of carrying on the business; what improvements, if any, could be suggested that would be more in accord with the general policy of conducting the business in which the defendant corporation was engaged at Toledo, Ohio".[4] 119 F.Supp. at page 82.

Plaintiff argues, however, that the law has changed since the Montana cases were decided. It is true that the permissible scope of state jurisdiction over foreign corporations has been expanded, but this does not necessarily mean that the enlarged authority will be exercised. Nevertheless, it seems probable that the expanded authority of the state may well result in a more liberal construction within Montana of the meaning of the phrase "actually doing business within this state." Accordingly, it is advisable to consider some of the more recent decisions upon which plaintiff relies.

In International Shoe Co. v. State of Washington, 1945, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, the court held that defendant's "operations established sufficient contact or ties with the state of the forum to make it reasonable and just according to our traditional conception of fair play and substantial justice to permit the state to enforce the obligations which appellant has incurred there." 326 U.S. at page 320, 66 S.Ct. at page 160. This, it is true, was a new criterion, and has been followed in many subsequent cases;[5] but an analysis of the facts as set forth in the court's opinion shows clearly that it is distinguish-

4. The Court continued: "These seem to be the principal material facts confronting the court in this case; there are some other questions raised by plaintiff such as the alleged threat of suit for use of the Willys-Overland authorized dealer sign after the contract had been cancelled, the approval by defendant corporation of the contract between the dealer and the distributor, and a meeting of dealers and distributors with representativos of the said corporation in Great Falls which seemed to resemble a school of instruction, but the court regards these matters of minor significance when considered in connection with the real question involved—that of doing business in Montana and actually being present here for that purpose." 119 F.Supp. at page 82.

5. Subsequent cases applying the test that due process requires "minimum contacts" such that the "maintenance of the suit does not offend 'traditional notion of fair play and substantial justice'" include Travelers Health Ass'n v. Commonwealth of Virginia, 1950, 339 U.S. 643, 648, 70 S.Ct. 927, 930, 94 L.Ed. 1154; McGee v. International Life Ins. Co., 1957, 355 U.S. 220, 222, 78 S.Ct. 199, 2 L. Ed.2d 223; Hanson v. Denckla, 1958, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283; Perkins v. Benguet Consolidated Mining Co., 1952, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485, where the court said: "The amount and kind of activities which must be carried on by the foreign corporation in the state of the forum so as to make it reasonable and just to subject the corporation to the jurisdiction of that state are to be determined in each case". 342 U.S. at page 445, 72 S.Ct. at page 418. All of these cases, in my opinion, are clearly distinguishable from the instant case. See also an excellent discussion of the foregoing cases in Erlanger Mills v. Cohoes Fibre Mills, Inc., 4 Cir., 1956, 239 F.2d 502.

able from the instant case. It involved the question of whether the State of Washington could exact contributions to the state unemployment compensation fund from a foreign corporation consistently with the due process clause of the Fourteenth Amendment. The corporation contended that its activities within the state were not sufficient to manifest its "presence" there and in its absence the state courts were without jurisdiction to subject it to suit. The defendant was engaged in the manufacture and sale of shoes and it employed 11 to 13 salesmen who resided in Washington and whose principal activities were confined to that state. In holding that the corporation was "present" within the state the Court said:

" 'Presence' in the state in this sense has never been doubted when the activities of the corporation there have not only been continuous and systematic, but also give rise to the liabilities sued on, even though no consent to be sued or authorization to any agent to accept service of process has been given. (citing cases) Conversely it has been generally recognized that the casual presence of the corporate agent or even his conduct of single or isolated items of activities in a state in the corporation's behalf are not enough to subject it to suit on causes of action unconnected with the activities there. (citing cases) To require the corporation in such circumstances to defend the suit away from its home or other jurisdiction where it carries on more substantial activities has been thought to lay too great and unreasonable a burden on the corporation to comport with due process.

\*    \*    \*    \*    \*    \*

"It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less    \*    \*    \*

"But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.    \*    \*    \*

"Applying these standards, the activities carried on in behalf of appellant in the State of Washington were neither irregular nor casual. They were systematic and continuous throughout the years in question. They resulted in a large volume of interstate business, in the course of which appellant received the benefits and protection of the laws of the state, including the right to resort to the courts for the enforcement of its rights. The obligation which is here sued upon arose out of those very activities." 326 U.S. at pages 317–320, 66 S. Ct. at page 159.

In United States v. Scophony Corp., 1948, 333 U.S. 795, 68 S.Ct. 855, 861, 92 L.Ed. 1091, it was held that a foreign corporation which was attempting to conserve and exploit inventions and patents in New York State was "transacting business" and was found in New York within the meaning of the Clayton and Sherman Anti-Trust Acts, 15 U.S.C.A. §§ 22, 1, 2. The test followed by the Court in determining whether the corporation was transacting business in New York was whether the corporation "transacts business" in the state "of any substantial character." The factual situation has no application to this case.

Frene v. Louisville Cement Co., 1943, 77 U.S.App.D.C. 129, 134 F.2d 511, 146 A.L.R. 926, is a leading case reflecting the liberal viewpoint and is strongly relied upon by plaintiff. Defendant was a Kentucky corporation making and selling cement and cement products. De-

fendant's salesman Lovewell spent more than half his time in Washington soliciting orders and visiting jobs in the course of construction where defendant's products were being used. Lovewell would suggest how to overcome difficulties, go over any complaints with regard to materials and report them to the company. Lovewell called at plaintiff's house three or four times during the course of construction. He had no authority to conclude contracts, make binding sales or to make adjustments or compromises. Concerning the volume of business in the District Lovewell stated: "We sell quite a quantity of this material * * *. If this were a nice construction day, there would be literally hundreds of jobs going on in the District of Columbia using our material." 134 F.2d at page 512. The principal question was whether the activities of Lovewell in the District of Columbia constituted doing business by defendant so as to make it amenable to process. In holding that the defendant was doing business within the District, the court stated: "It is now recognized that maintaining many kinds of regular business activity constitutes 'doing business' in the jurisdictional sense, notwithstanding they do not involve concluding contracts. In other words, the fundamental principle underlying the 'doing business' concept seems to be the maintenance within the jurisdiction of a regular, continuous course of business activities, whether or not this includes the final state of contracting * * *"

"* * * It is still true, generally speaking, that mere casual and occasional acts do not furnish a sufficient basis for assertion of jurisdiction of the person in cases of nonresidents." 134 F.2d at page 515.

Plaintiff argues that in the "solicitation cases" cited by defendant the activities of the salesmen were incidental to their solicitation and sales, whereas in "the instant case, the solicitation and sale of equipment is strictly incidental to the business done by defendant in Montana, viz., engineering and supervisory services. Put as bluntly as possible, plaintiff contends that the engineering and supervisory activities of defendant in the state of Montana were of themselves sufficient to constitute a doing of business for the purpose of the service of process statute, and within the concepts of 'doing business' laid down in the International Shoe case, as sufficient in its quality and nature to permit service of summons under the fair and orderly administration of the laws." Page 27, plaintiff's brief. There was no contract, however, between plaintiff and defendant. Any consideration accruing to defendant from the transaction came from the sale of the machinery by defendant to Ward and possibly indirectly from plaintiff's contracting with Ward to do the construction work. This does not, in my opinion, justify the conclusion that the solicitation and sale of the equipment were "strictly incidental to the * * * engineering and supervisory services". Moreover, the actual sale of the equipment by defendant to Ward did not take place in Montana.

In any event, there is no evidence that the defendant was engaged in "continuous and systematic activities" within the State of Montana at the time the cause of action arose. This is necessary to meet the statutory requirement of "actually doing business within this state" as construed by the Montana Supreme Court and cases generally. Nor, in my opinion, did the defendant in this case have the "minimum contacts" with the State of Montana such that the maintenance of this suit would not "offend traditional notions of fair play and substantial justice."

Defendant's motion to quash the service of summons is granted.